# EXHIBIT A

STATE OF FLORIDA         )
                         ) *SS.:*
COUNTY OF HERNANDO       )

I, Umesh Heendeniya, being a resident of Hernando County, Florida, pursuant to 28 U.S.C. § 1746, declare under the penalties of perjury that the following statements are true and correct except as to the statements which I aver on knowledge, information, or belief formed after reasonable inquiry, and as to them, I believe them to be true:

## FACTUAL BACKGROUND

**I. EVENTS in 1995 in OKLAHOMA.**

1. On April 19, 1995, a former U.S. Army Soldier by the name of Timothy McVeigh detonated explosives outside the Alfred P. Murrah Federal Building in Oklahoma City, Oklahoma, killing and injuring many people.

2. At the time, I was a college student studying computer science while attending Oklahoma State University in Stillwater, Oklahoma. Stillwater is a college town, located approx. 1-hour north-east of Oklahoma City.

3. I emphatically state that I had nothing whatsoever to do with this national tragedy, and I did not know Mr. McVeigh or any of the other people implicated in the matter.

4. The fact that on Sept. 1st of that year, I was forced to discharge my handgun in lawful self-defense, fatally injuring one of my attackers, had nothing whatsoever to do with the national tragedy that had occurred 5-months prior.

5. As an important reminder, in the ensuing jury trial, I was acquitted by a 12-person jury in June, 1996. Furthermore, I have never been convicted of any felonies.

*Umesh Heendeniya v. Thomas Miller, et al.*

## II. EVENTS FROM EARLY SEPT., 2010 to LATE JAN., 2015.

6.      In early Sept., 2010, while living in Massachusetts, I met a lady from Iran, online on Skype.

7.      After communicating daily online, we started an online romantic relationship.

8.      Because she was a Muslim while I was a Christian, and her religion forbade such romantic relationships, I became a Muslim sometime in September, 2010.

9.      Within approx. a month or so of our online relationship, I began to send her romantic cards, letters, etc., by mail, to Iran.

10.     It was then that I noticed that I was being subject to surveillance.

11.     On information and belief, I was subjected to surveillance from then on until I left Massachusetts in May, 2014, by agents/officers/deputies/troopers located in Massachusetts.

12.     For purposes of this affirmation, I want to define two types of surveillance that I was subjected to for the past approx. 7 (seven) years: "overt surveillance" and "covert surveillance."

13.     Overt surveillance happens when those who are following someone (i.e., the target of the surveillance) don't make any attempt to hide what they are doing, and may additionally subject their target to overt and deliberate intimidation and high stress, and additionally, they may also converse with their target.

14.     Covert surveillance happens when those who are following someone will make every attempt to follow someone surreptitiously without the target's knowledge. If their target notices that s/he is being followed, it would be unintended.

15.     When I was subjected to surveillance during late 2010 and most of 2011, the surveillance was covert, but it was obvious to me that they were trying to be discreet in following me.

*Umesh Heendeniya v. Thomas Miller, et al.*

16.     I remember how in late 2010 and in 2011, when I went to several different post offices to mail different items, I observed the same guy driving the same vehicle coming to that post office, approx. as I was leaving the parking lot. This was after I would go to post offices located in different, but close-by cities, in order to verify whether I was being followed, or to find out whether I was imagining.

17.     Whoever was subjecting me to surveillance once even followed me to the Middlesex Superior Court in Woburn, Massachusetts, where I had 2 employment discrimination lawsuits from approx. May, 2011 onwards.

18.     As an example of when I was subjected to overt surveillance, sometime in Fall, 2011, my mother accompanied me to the Woburn courthouse for a hearing in one of my cases.

19.     While we were seated outside one of the courtrooms, waiting for the courtroom to open so my case would be called, a middle-eastern looking man in a suit approached us and began talking to us.

20.     He was dressed wearing a suit, carrying some papers, trying to appear as if he was an attorney who happen to be waiting for the courtroom to open, so he could attend to his case(s).

21.     He began talking to my mother, but it became obvious that he wanted to engage me in a conversation.

22.     At the time, I had heard of and read many news stories where Muslim men were being targeted for entrapment schemes by the Federal Bureau of Investigation ("FBI") and the Joint Terrorism Task Force ("JTTF") agents/officers/deputies/troopers, so that they could be arrested for terrorism related charges and conspiracy-type charges.

23. Hence, because I was a Muslim man during that time period, I was leery of this stranger's attempts to befriend me at the courthouse, and his stories about how his mother was Egyptian and his father was Jewish, etc.

24. When the courtroom opened, and while we stood up to go in, he wrote something on a piece of paper, and handing it to me told me to contact me, that the note contained his email address.

25. Once we went in, I directed my mother away from the guy and we sat on another side in the courtroom.

26. I never saw him go and talk to the judge or the judge's clerk, and "any case by him" was never called before the Court.

27. After a few minutes, before my case was called, I looked around the mostly empty courtroom for the man, but he was nowhere to be found, and I never saw him again.

28. I figured that my intuition had been correct, and that this was probably someone from the group that had been subjecting me to surveillance for the past approx. one year, attempting to perhaps do an entrapment operation on me (i.e., I was supposed to end up being the sucker, and face a terrorism-related criminal or conspiracy charge).

29. I remember 2 other specific incidents where I was subjected to overt surveillance: once in 2012 in North Adams, Massachusetts, and the other time in a small city in the eastern past of New York.

30. There were other instances of overt surveillance where I was subjected to stress and fear, intentionally by this surveillance team/group, but the overwhelming majority of time, when I lived in Massachusetts, I was subjected to covert surveillance.

*Umesh Heendeniya v. Thomas Miller, et al.*

### III. LATE JAN., 2015 to PRESENT.

31.     It had been more than 1 ½ years since I had stopped being a Muslim, I had repented and gone back to practicing my faith as a Christian.

32.     In mid January, 2015, I called St. Joseph's Hospital Health Center ("SJHHC") after discovering that I may be prohibited under federal law from possessing any type of firearms or ammunition, due to federal penal code 18 USC §922(g)(4).

33.     After communicating with SJHHC officials and trying to get them to help me regain my firearm rights, I realized that they would not assist me, and that the only way I could regain my Second Amendment rights was through a federal lawsuit.

34.     Thus, in preparation for filing the lawsuit and to get the necessary documents ready, I obtained a U.S. postal mail box.

35.     I began writing and requesting various documents and other evidence that I thought I would need, in order to litigate the lawsuit that I would need to file in federal court for the northern district of new york.

36.     I noticed that my postal mail relating to the lawsuit, that I was receiving in the p. o. box, was being looked at by someone. I knew this because most of the envelopes that I received were torn open and obviously, my mail was being read.

37.     Soon after I opened the p. o. box and began obtaining documents by mail, in preparation to file the lawsuit, I was increasingly subjected to <u>overt surveillance</u>.

38.     While I lived in Massachusetts, the instances of overt surveillance had been several times but had been sporadic, from approx. late Jan., 2015, the instances of overt surveillance (and attending intimidation and harassment) while living in Florida began to increase.

39. By now, I had been subjected to covert and overt surveillance for approx. 4 ½ years. But with the increase in the frequency of the instances of overt surveillance that I was being subjected to after having moved to Florida and after making preparations to file the instant lawsuit, I decided that I needed find out who was harassing me and tormenting me.

40. Therefore, in Feb.-March of 2015, I filed FOIA/PA requests with the FBI, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and the U.S. Postal Inspection.

41. Both the FBI and the Postal Inspection wrote back within the statutory time period and essentially refused to disclose information, citing exemptions to 5 U.S.C. §552 and 5 U.S.C. §552a. However, the ATF ignored my FOIA/PA request, and I didn't hear back from them in 2015.

42. My mail at my p. o. box continued to be torn open, and I continued to be subjected to overt surveillance, and, on information and belief, covert surveillance.

43. Then, in early 2016, things became much worse. On Friday, January 15, 2016, in the afternoon, three officers from the "Hernando County Special Task Force" with hand guns came to my home and unlawfully and coercively interrogated me.

44. Since the ATF had not replied back to me on my FOIA requests the previous year, I suspected that these officers were in fact affiliated with the ATF.

45. Initially, after I came to the door, and after peering through the peep hole, I didn't want to open the door, and tried various methods to prevent these officers from interrogating me.

46. As I would later find out with the aid of Florida Public Records Law requests that I submitted to the Hernando County Sheriff's Office (HCSO), the lead agent during this encounter was Thomas F. Miller ("Tom Miller" or "S.A. Miller"), and I would find out several months later that he was an FBI agent assigned to the JTTF unit based out of Tampa, FL. There was another

FBI special agent by the name of Sonya Yougue present who was observing the unlawful interrogation, and was probably the agent who wrote the Form-302 after she went back to her office. The third officer present was a Hernando County Sheriff's Detective by the name of David Kortman ("Dave Kortman").

47.     When I tried to shout through the door and speak to them, S.A. Miller engaged in deception by falsely claiming that they can't hear me, and to please open the door because they had a few questions to ask me.

48.     In my attempt to maintain a barrier between the 3 cops and me, I opened the front door, but kept the storm/shutter door locked, and attempted to speak to them, but solely to inform them that I was asserting my Fifth Amendment privilege against self-incrimination and my right to counsel (*via* the *Miranda v. Arizona* decision, the Due Process clause of the Fifth Amendment, *Edwards v. Arizona*, 451 U.S 477 (1981), R*hode Island v. Innis*, 446 U.S. 291 (1980), and *Davis v. United States,* 512 U.S. 452 (1994) decisions).

49.     But S.A. Miller continued to lie and deceive, this time claiming that it was difficult for him to hear me through the glass of the storm door.

50.     I held a copy of the lawsuit that I had filed a few months back in the northern district of new york against the glass surface, attempting to show them that the "special agents in charge" of the FBI and the ATF were defendants in the case (the case was filed on October 19, 2015).

51.     In fact, I knew on that date in mid-January, 2016, that a record of the lawsuit (including the case title and the list of all the defendants) was showing up on the Google search engine, whenever my name of entered as the search term. This record was displayed by http://www.justia.com. Hence, I was perplexed by the apparent rash behavior or the remarkable

ignorance of the 3 cops. The link for this web page was appearing on Google by early December, 2015, for anyone who did a Google search with my name as the search term.

52. On that Friday afternoon, I was assuming that these were agents from the ATF, and thus I tried to explain to them that, in addition to my Fifth Amendment rights, the concept of "conflict of interests" prevented them from continuing to unlawfully question me against my will.

53. S.A. Miller again engaged in lying and deception, and this time claimed that the sun was shining against the glass and that he could not read the court papers that I had held up against the glass so he and the other 2 cops could see the case caption and understand about the obvious conflict of interest in them interrogating me. Ignoring any concern for legal or ethical factors, S.A. Miller verbally pressured me to open the door so the 3 of them could look at the complaint.

54. As soon as I opened the storm door, S.A. Miller immediately leaned into the side of the storm door thus keeping it open, and thereafter <u>placed one of his feet slightly inside the entrance of the house without being invited to</u>, so that he was in effect, blocking me from being able to close the front door.

55. Now I suddenly found myself in a very stressful situation because S.A. Miller had continued with the interrogation while I was trying to stop the interrogation and make them leave.

56. But, In order to do that, I was forced to try to reason with this one cop who was openly defying the law and any semblance of ethical conduct required of a sworn law enforcement officer. All the while, the other 2 cops stood by in his support, glaring at me while intermittently placing their hands on their hips a few inches from their plainly visible semi-auto pistols.

57.   The 3 cops were standing at my door in a "reverse V" formation, with S.A. Miller and S.A. Yougue on either side of the door, while HCSO detective Kortman in the middle, but approx. 6 feet behind Miller and Yougue.

58.   At one point, when I again asserted my right to speak to an attorney, S.A. Miller told me to "call your lawyer." Obviously, these agents had carefully done their research, and knew that because I was indigent, I didn't have an attorney on call, that I could call on speed-dial, so to speak.

59.   I showed them the lawsuit complaint that I had filed approx. 3-months prior, and showed them where the FBI and ATF "special agents in charge" were listed in the complaint, and told them that it was a conflict of interest for them to question me.

60.   Since I didn't have my own attorney on call, on speed-dial, so to speak, I told them that I wanted a public defender appointed to represent me and that I wanted to assert my right to remain silent. But, S.A. Miller had an answer to that too. He told me that I was not currently facing a criminal charge, and thus they could not get a public defender for me, and that they wanted to ask a few questions.

61.   They continued to unlawfully interrogate and/or interview me, and ask me questions about web postings I had allegedly made.

62.   At one point, when I declined to speak to them any more, S.A. Miller used an advanced interrogation tactic by coercing me to talk even though I had repeatedly asserted my constitutional right to remain silent and my right to have the assistance of an attorney while being questioned. One of the tricky ways he did this is, for example, was by asking me a series of questions such as: "So, your name is Umesh Heendeniya, and you live here, and you own this home, and you filed this lawsuit to regain your gun rights...", thereby immediately causing me

*Umesh Heendeniya v. Thomas Miller, et al.*

significant concern because I was worried that-- by continuing to remain silent-- I would be implicitly saying "yes" to this series of questions. I was aware of the legal peril that lay in the federal penal code 18 USC §1001(a)-- "lying to a federal law enforcement officer." Therefore, I was forced to break my silence and respond to his series of questions in order to avoid implicitly implicating myself in a violation of 18 USC §1001(a).

63. I had lived continuously in the home that I occupied on Jan. 15, 2016, ever since I had relocated from Massachusetts in May, 2014. But I didn't own the home.

64. Thus, when S.A. Miller used subterfuge and asked the series of questions that I would have to explicitly answer or implicitly answer, in panic, I immediately realized that if I kept silent by refusing to answer their questions, because S.A. Miller was implicitly asking me a string of questions, my silence meant that I was implicitly telling him "yes" to each of these successive questions, unless I spoke up and corrected his understanding to one or more of these questions. Thereby, I would end up unintentionally being exposed to being falsely accused of lying to a federal agent under 18 USC §1001.

65. I had known about the 18 USC §1001 trap because of a video I had seen on Youtube some years back while I lived in Massachusetts, that was put out by the ACLU of Massachusetts of which I had been a dues paying member.

66. In addition, even though I wanted to remain silent and not answer any questions that were forced upon me by S.A. Miller, I certainly was not going to lie to him even implicitly (i.e., lying by omission), in order to avoid responding to his coercive, unlawful, and unethical interrogation of me.

67. Thus, due to S.A. Miller's deceptive and unlawful tactics, I was kept from being able to assert and enjoy the constitutional rights that I'm entitled to, including the privilege against self-incrimination and the (pre-arrest) right to counsel (*via* the *Miranda v. Arizona* decision, the Due Process clause of the Fifth Amendment, *Edwards v. Arizona*, 451 U.S 477 (1981), R*hode Island v. Innis*, 446 U.S. 291 (1980), and *Davis v. United States,* 512 U.S. 452 (1994) decisions).

68. S.A. Miller used several tricks-of-the-trade of coercive interrogation and/or coercive Interviewing to unlawfully question me against my will, even though I attempted to invoke my right to remain silent and my right to speak to an attorney on multiple occasions.

69. They used prior noted coercive means to unlawfully interrogate and/or interview me about the purpose of my lawsuit. I told them that I had been unlawfully kept in the psychiatric unit of SJHHC, and that allegedly, due to the operation of 18 USC §922(g)(4) I had lost my firearm rights, and thus I was trying to regain my Second Amendment rights *via* this lawsuit.

70. At one point, S.A. Miller even brought up the issue of U.S. Citizenship and the Second Amendment by stating that as a U.S. Citizen he liked guns. <u>When he said this, I saw S.A. Sonya Yougue look/stare hard at me in a very stern manner</u>. It was obvious that they were attempting to use the U.S. Citizenship factor to intimidate me, and also to keep me off balance while interrogating me, against my will.

71. Clearly, these 3 agents had done their homework and made a careful, thorough preparation to interrogate me, by unlawfully and unethically overcoming my resistance (i.e., my assertion of my constitutional right to remain silent and my right to talk to an attorney).

72. S.A. Miller continued interrogating me and pressuring me to speak to them, and told me that he likes to go fishing and asked me what kind of activities I did for enjoyment. It was obvious that at this stage of the interrogation, he was trying to butter me up, and get me to

provide them more information, possibly to set me up for a fall (i.e., some bogus federal criminal violation that they can come up with, and resulting incarceration in the event that I'm convicted).

73.     Fortunately, at this point, I remembered my video camera that was in one of the rooms in my home, and being concerned about the 18 USC §1001 trap that federal agents frequently use, I told the 3 agents that I was going to record this questioning of me.

74.     I quickly went into my room and got my video camera and started video recording the unlawful interrogation of me by these 3 agents.

75.     However, immediately, both S.A. Miller and HCSO detective Kortman told me that I cannot video record and that I can only audio record the questioning.

76.     This was another deception and trick by these cops, whereby they violated my First Amendment Right by preventing me from being able to video record the unlawful interrogation and/or interviewing of me. See, *Smith v. City of Cuming*, 212 F.3d 1332 (11th Cir. 2000).

77.     From that day on, I was subjected to daily, intense, overt surveillance, harassment, and intimidation.

78.     I knew that because my medical records were online, and a simple search on Google would bring up many of my medical records on http://www.justia.com, that these agents and officers who were subjecting me to this daily, intense, overt surveillance, harassment, and intimidation either didn't give a damn about the incredible stress that they were subjecting me to and the risk to my physical and mental health, or they wanted me dead.

79.     After all, anyone (including law enforcement officers) could get on PACER and look up my lawsuit documents and figure out that I had either attempted suicide or engaged in suicidal behavior in early April, 2013. Thus, given the aggressive and very callous behavior of the law enforcement officers and agents who subjected me to daily, intense, overt surveillance,

harassment, and intimidation, it's not a stretch to conclude that the possibility of my death or serious harm to my physical or mental health was not the least bit of concern for these law enforcement agents and officers.

This concludes my declaration that contains paragraphs numbered 1 through 79.

Dated: Jan. 15, 2020
Hernando County, Florida.

Umesh Heendeniya
(508)-630-6757 [Main cell phone number]
P.O. Box 5104
Spring Hill
FL-34611.

*Umesh Heendeniya v. Thomas Miller, et al.*